Submitted today on oral argument, beginning with United States v. Garcia De Nieto, Mr. Morales. Thank you, Your Honor. May it please the Court, I represent Elizabeth Garcia De Nieto. And I know the Court is well aware of what the accusations are against my client, having to do with, to put it very simply, tax fraud issues. What the scheme and the conspiracy here basically involved was the submission of fraudulent information, identities of individuals, through the tax return system, basically filing false tax returns and retrieving the monies that would come back on their return. Now, what I'm suggesting here for you all to consider, Your Honor, is that we're not here to suggest that my client bears no criminal liability in this matter, that she's somehow innocent of all of these things. I think there's ample evidence to prove that she was involved to a certain extent. The gravamen of the complaints that I raise in my brief have to do with the proper measure of criminal liability. What is the proper sentence? Whether we capture it through the guidelines or capture it with the discretion of the Court, what Ms. Garcia De Nieto complains of is about the lengthy sentence that she received after sentencing by the district court. The concerns that we raise have to do with those issues and surrounding how we came to the decision of how much time was she going to spend in federal prison. Both of these things surround the loss and the computation of losses. That was the largest enhancement under the guidelines and really is the biggest chunk of all of this. Where we begin is how the loss was calculated at the district court level. And what I've suggested here is that in the trial of the case, if you review the transcripts and the actual trial, the operative exhibit here has to do with this government's Exhibit 2A, a summary of these 1,700-some-odd tax returns that the primary witness for the government, Agent Peavey, testified to having discovered throughout the lengthy investigation into these matters. Now, what is troublesome about this, Your Honor, is that the — within that government 2A is a summary of many individual tax returns. Now, at trial, not all of these individual tax returns were investigated, each and every one. That would have been a ridiculously lengthy — Over 1,700 of them. Is that right? That's right, Your Honor. Over 1,700 of them. However, there were certain sections of these that were submitted throughout the trial. For example, government's Exhibit 2, which contained, I believe, was 19 individual packets, individual items that were presented as evidence to support the summary of the larger 1,700. But again, what's troublesome about this, Your Honor, is that we're talking in the confines of the agent's testimony, the way I understood it, was it began with an individual known as Mr. Ramirez, who was submitting these checks to various check-cashing concerns in the El Paso, Texas, area and cashing the checks. Now, Agent Peavey contacted the individual, the owner of the check-cashing concern, and discovered this individual had been cashing a large number of checks at a particular check-cashing concern. And that's how the investigation from that point kicked off in the El Paso area. But what had transpired, or what I believe transpired, in the trial itself was Mr. Ramirez was running his own scheme, along with perhaps another individual, a Mr. Lattis. That evidence was adduced at trial as well. So we have several different schemes going on. Now, what was not parsed out at trial was, and not really parsed out in the sentencing of my client, either in the pre-sentence report or just in general by the court, were which of these returns, which of these items were actually attributable to my client, Ms. De Nieto. And again, I think at trial we developed that there were several different conspiracies running. What the court needs to understand is that we're not talking about an unusual or actually very complex criminal scheme here. It's really rather simple. You get someone's individual information, name, Social Security number, address, date of birth, fill out a 1040, and send it in. Because of the volume that the IRS handles every year, the return will likely come back. Now, what do you do with that return? Well, you fill it out to maximize the return you're going to get. So you fill out something like someone that's self-employed, where there's no W-2s, no real paper trail to follow without some kind of audit. You ask for the child tax credit, again, to maximize the return. All of these things operate in tandem, but they're not unique. There are many, many, many people, unfortunately, that run the same scheme. So what we have here, Your Honor, is perhaps the mixing and matching of several different conspiracies all within the confines of the one. And — But the returns across the board were quite similar, weren't they? They showed similar occupations, such as a barber or a nail salon, and they were more or less $5,000 or less, and two dependents or those sorts of things. That's correct, Your Honor. I can't tell you that they weren't this similar in that way. But again, what we're looking at here, and I guess what the government would try and tell you, is that this is some kind of signature, that this is somehow indicative or some kind of identifier as to Ms. DeNieto. What I'm suggesting, Your Honor, is that, well, while all of this may be true, that these various returns are all similar in the way that they were submitted, they're really not uncommon for these types of schemes. What we're talking about, Your Honor, is not a fingerprint. This is not DNA, nothing like that. But again, these are common knowledge-type items to people that traffic in this sort of criminal activity. How do you maximize a return without raising too much of an eyebrow? We're still talking about your complaint about the loss calculation, not the sufficiency of the evidence. Yes, Your Honor. And so with regard to the loss calculation, what should the amount have been? Your Honor, we estimated, the defense estimates, that the loss should have been somewhere in the neighborhood between about $1.5 million to about $2.5, but not exceeding $3 million. In total, my client was sentenced on an amount that reached just under $9 million, having to do with perceived loss or expected returns, which never got cashed, and actual monies that came to one of these conspiracies, if not many of them. But that's our suggestion, Your Honor, is that the loss was not really hammered down properly at the district court level. We could have done a lot better job of trying to attribute what the actual loss should have been and what actual criminal liability Ms. Garcia de Nieto should have been found liable for. We think that it's far in excess of what actually transpired and what she actually was involved in. But the restitution was just right at that $3 million figure that you just mentioned. Yes, Your Honor, because that was the actual monies that were paid out by the Internal Revenue Service. The remainder of that was, I guess, returns that were still in the process and never actually been paid out to anyone. So although those things can very much so, and I understand how the guidelines work, the loss in those areas can be considered as part of the total loss. My suggestion, Your Honor, is that that number far exceeds my client's actual criminal liability. What difference would that make in terms of the sentence, in your view? About 18 levels, Judge. The enhancement was an 18-level enhancement, which is significant. How the court would have actually ruled on that, given some discretion by the district court, is, I guess, still left up to some estimate or some guess. But the levels that we're talking about, the level increase, the enhancement under the guidelines is significant. For purposes of the guideline range? Yes, Your Honor. And the sentence was 16 years, is that right? 16 years, Your Honor, followed by a consecutive sentence of, I think it was another five, if I'm not mistaken. But for these, for the conspiracy count, yes, it was 16 years, Judge. Now, so the first two issues that we present, Your Honor, are somewhat related, although they approach the problem from different perspectives. One has to do with how we calculated the loss. The second has to do with the criminal conspiracies and whether the court captured these things in trial in the proper way. Sometimes what we'll do is we'll ask for a multiple conspiracies instruction, something along those lines. However, that didn't happen in this case. The case was submitted to the jury strictly under pretty basic jury instructions. And although my client was found guilty under each of those counts, there are certain problems within the way that the loss was calculated. Now, I'll move on to the other two issues just to so that we're clear on these things, Your Honor. There were three other counts, alleging aiding and abetting. And what I believe was going on with these aiding and abetting counts is the government in the presentation of their case was trying to put a face on this otherwise kind of amorphous sort of victimless kind of crime, if we could call it that, although the government was a victim in this instance. I think the government counsel, the U.S. Attorney's Office, wants to put a face on these things and present someone to the jury that has some connection to all of these things. But what occurred, Your Honor, is that while the government might point out that there are certain small areas where — or certain evidence that was presented that seems to suggest that my client was involved in some criminal act, which, again, we're not denying that there was some evidence to that. I think it falls far short of being able to find Mr. Nieto guilty beyond a reasonable doubt for aiding and abetting. There was simply not enough evidence presented to find Mr. Nieto guilty beyond a reasonable doubt. Now, I understand that the jury found that. However, I think mixed into the larger case and the larger aspects of this case and the volume of information and evidence that was presented at trial, I think the jury could have been somewhat overwhelmed and maybe not appreciate some of the nuance and some of the elements that were presented to them. Now, perhaps that's a failing of trial counsel. Perhaps that's a failing of our instructions. But nevertheless, we have an issue here, Judge, that needs to be addressed. We have three other counts that my client was found guilty of.  And we're talking about several different conspiracies, several different people running the same sort of schemes. These individuals had no contact with my client. And not to suggest that they should have had contact with my client, but they themselves had no idea of Ms. Garcia de Nieto's existence. Now, of course, I'm not going to suggest to you that that's necessary in these types of schemes, and oftentimes an identity theft occurs that way where the perpetrator is not identified by the victim and can't be. However, with Ms. Garcia de Nieto's conduct in all of this, it's difficult to point directly to what's necessary to find her guilty beyond a reasonable doubt. Now, I'd like to close, Your Honor, with the last issue that we have, having to do with appellant's right to counsel of her choice. That's the last issue we bring up. What occurred here, Your Honor, is that my client had retained the services of Mr. Del Valle, who had previously represented, I suppose, one of the co-defendants in the case who had some connection to Ms. de Nieto, who had pled guilty long before Ms. de Nieto was brought before the court and before her case was processed by the district court. There was some relationship between the two. I'm not going to suggest there wasn't. There may have been an apparent perceived and actual conflict of interest in this case. That may be all true and all correct, but the problem that we have here, Your Honor, is that the district court and the government acted in concert in removing a counsel, without so much as a hearing. That can't be the way that we operate here, Your Honor. That can't be the way. But don't we have some case law in which there was no hearing and we went ahead and approved the disqualification of counsel? Well, I think the difference in some of those areas, Your Honor, is that the defendant in some way had an opportunity to be heard or present their side of the case. In this instance, Your Honor, the government's motion to remove counsel came the same day as the district court's order to remove counsel. Defense counsel was not given any opportunity to respond in any way, shape, or form. That can't be the way we operate, Judge. Well, Judge Martinez is not the sort of judge who would do something like that in any kind of an unfair way. I know you agree with that. I can't disagree with you, Judge. He's as fine a trial judge as there is. I have to assume that he handled it properly. Well, I'm, for one, flabbergasted, Judge. I've practiced in front of Judge Martinez for close to 20 years now, and as the Court suggests, typically he's without reproach. And I was very surprised when I saw how the district court handled this, Your Honor. But what's instructive as well is how this court handled it when Mr. De Valle again came back again to attempt to represent Ms. Garcia-De Nieto on appeal and actually submitted a brief. What Your Honor did was ask the district court to hold a hearing to make findings of fact, conclusions of law about the conflict of interest. Now, Mr. De Valle was ultimately removed. I'm not going to contest that, and I'm not going to suggest that that may or may not have been proper. But, again, I think that at the least due process should apply. All right. You've saved time for rebuttal. Thank you, Mr. Morales. Thank you, Your Honor. Mr. Richter. Would you mind just while it's on our minds going ahead and handling the disqualification issue first? Absolutely, Your Honor. I don't want to mess up the plan of your argument, but it's a discrete issue. That's fine. I'm happy to address the issues in any order that's helpful to the Court. Zachary Richter for the United States. And I don't think that counsel has identified any error in the disqualification, and it's clear that there was both an actual and serious potential conflict here. That's all that's necessary under the Supreme Court's decision in Wheat v. the United States, is that the district court, and we defer to the district court's informed discretion in these instances, has determined that proceeding in this instance with a conflicted counsel or a potentially conflicted counsel is too risky. With respect to the issue of a hearing, we know from this court's decision in Ahmaud that the district court has discretion as to whether to hold a hearing, and that decision as to whether to hold a hearing is reviewed for an abuse of discretion. There's no abuse of discretion here because Judge Martinez knew already from having presided over the guilty plea of this co-defendant exactly what this co-defendant was saying, namely that the defendant here, Ms. DiNieto, had instructed her to impersonate her at the border to retrieve fraudulently prepared tax returns. And she also said during her factual basis for guilty plea that Ms. DiNieto was producing fake tax returns. And was instructing her to send them into the United States and was instructing her to send wire payments into the United States to her contacts there. So Ms. DiNieto, when she was interviewed by law enforcement at the time of her arrest, said that she did not send this person in to impersonate her, that this person had volunteered to go and that this person volunteered to go so that she could try to have her baby within the United States. So these two positions were diametrically opposed. There was no way for an attorney to represent both of these defendants at once or even sequentially without having to say that one or the other of them was a liar. That was an actual conflict. There was also the problem that the original attorney had confidential communications from this other co-defendant, Ms. Chirubiates, and he could not have disclosed those to Ms. DiNieto without a waiver from both sides. And so because of that, Judge Martinez would have known just from hearing the guilty plea and seeing the fact of the allegations against Ms. DiNieto that there was an actual and serious potential conflict here. And that was enough for Judge Martinez to say we don't need to have a hearing about this. I'm prepared to disqualify this counsel. And again, under Wheat v. the United States, that's a decision that this court defers to and is reviewed only for an abuse of discretion. Also, even if it was an error not to hold a hearing, that was harmless, because when this Court did remand the case after conviction, limited remand to see whether Mr. Devalle could serve as counsel on appeal, the district court held a hearing, all of those conflicts were fleshed out, and the district court reached precisely the same conclusion. The fact that this Court remanded for a limited remand at the government's suggestion in this case doesn't suggest that there was any problem with the original decision, because the whole thrust of Mr. Devalle's argument to stay in the case on appeal was that the circumstances had so substantially changed on appeal that there was no longer any risk of any kind of conflict. So the district — I'm sorry, this Court's limited remand shouldn't be taken as a suggestion that the district court abused its discretion or erred in any way in identifying the disqualification as the appropriate remedy here originally before trial. If that satisfies the Court with respect to the disqualification and the decision not to hold a hearing, I'll turn to the loss estimate, because that gives us a nice way to get our arms around the extent of the stolen identity refund fraud or SIRF in this instance. There were four steps to that estimate, and it's encapsulated within Government's Exhibit 1. I think Mr. Morales referred to Government's Exhibit 2A, but that was a preliminary calculation. Government's Exhibit 1, which is at page 1964 of the record, shows the final calculations that were used both at trial and were found in the PSR to be reliable, and then the district court later also found to be reliable. I would encourage the Court to look at the original Government Exhibit 1, because the scanned version of the Record on Appeal isn't very clear, and if that's not available from the district court, we'd be happy to provide it. But there were four steps in this calculation, in this loss estimate. First, the Government identified a number of returns and fraudulently issued checks that were linked to Ms. Danieto either by her own admission when she was interviewed or by witness statements when the Government got these returns. The Government took those addresses, those lists of addresses that were linked to Ms. Danieto by witness statements or Ms. Danieto's own statements, and the Government pulled all of the returns that were associated with those addresses. What we would expect is there would be one or two tax returns associated with any given single-family home or PO box, but there were many, many such returns, and those returns followed a signature pattern. There was always the head of household filing code or a single filing code. The business codes for the income was usually the same, a barber, a nail salon, or a salon. There was always just about the same amount of refund. There were always the same number of exemptions, the head of household and two dependents. And with all of those similarities, that pattern emerged. And so between the pattern of those returns and the addresses which were linked to Ms. Danieto, the district court was justified in estimating the loss at $8.2 million, which was the estimated loss in this case. Remember that the district — this is not a matter of sufficiency of evidence for a conviction, nor is it a matter of the jury instructions. When the district court makes a loss estimate, that's a matter at sentencing. The district court need only make a reasonable estimate. That's from this Court's decision in Jackson. In the district court, it doesn't have to be the most reasonable estimate. It just has to be a reasonable estimate of the losses. In addition, the pre-sentencing report reached that estimate as well based on the trial testimony. And the district court can use the PSR as a reliable source of an estimate, which the district court did here, taking into account the trial testimony. And when the district court does that, the defendant has the burden to show that the estimate was wrong or unreliable in some way. The district — the defendant here has offered only speculation that somebody else might have produced these returns. So explain the difference between the $3 million sum imposed in restitution and the $8.2 million that you just mentioned. Yes. The actual loss in this case was around the $3 million mark. So that's the returns that were actually resulted in refund checks that were cashed. So that's the actual loss. Under the guidelines, the district court has to look to the grader of the actual loss or the intended loss. The intended loss in this case was pegged to the number of fraudulent returns that were filed and linked through addresses in the pattern to Ms. Danieto. She tried to get $8.2 million, and that was the intended loss. Under 2B1.1 of the guidelines, it's the grader of the intended or actual. And so that's what the district court used in this instance. And one last point about the loss estimate, it's only by a preponderance of the evidence. So, again, we're not looking at a trial standard at all. But turning to the trial standard and the sufficiency on the aiding and abetting counts, the argument here is that these three particular victims of Ms. Danieto's crime were not linked to her in any particular way. And I have to take exception to the description of this crime as victimless. When somebody uses your name and your Social Security number to file a return, you have to then go back to the IRS and unwind that whole problem. And the PSR even identified a disabled person who had – who underwent substantial financial difficulty when his identity was stolen through Ms. Danieto's scheme, and fraudulent tax returns were filed on his behalf. And, in fact, he started having his disability payments cut because his tax returns, those fraudulent tax returns, showed income. So that's a person – So these were over – if I understand it, over 1,700 real people with real Social Security numbers and false returns. That's right. These were real names, real Social Security numbers, and sometimes there were multiple returns per person over several filing years. And these three particular victims were linked to Ms. Danieto through the evidence because, first, she used the name and Social Security number of one of these victims when she called the IRS and was taped calling the IRS Service Center. Her voice was identified by somebody familiar with her, and she represented herself and said, I am this person, gave the name, and gave the exact Social Security number. So we know that she was misusing at least that person's means of identification, which is the thrust of an aggravated identity theft charge. We also know that Ms. Danieto was linked because all of these three victims had fraudulent returns filed using addresses that were linked to Ms. Danieto, either that we know from talking to her co-conspirators with the United States, those were their addresses that they were using, or because Ms. Danieto herself used the address and gave that as a fake address when she was arrested by law enforcement. And then, of course, they also fit exactly the pattern, using the nail salon, barber shop, or salon, about a $5,000 amount of the return, only self-employment income so that you can avoid the IRS looking at your W-2 and comparing it against that. When she made these calls, that was because there was a refund that had not been paid. Is that what it was? She was checking on a refund, the status of a refund? Yes, Your Honor, in some instances, and sometimes just to see if there was any balance on the account. In fact, we linked a Skype number that was under Ms. Danieto's name and registered to her business address in Mexico, having made over 3,800 calls to IRS service centers. Several of those were taped, and her voice was identified in those. And in each instance, she identified a victim of aggravated identity theft, not necessarily these three, there was only one overlap there, but she gave somebody's name and Social Security number, but it was a real name and Social Security number, and it was associated with fraudulent returns that were linked to her through witness statements, the pattern, or her own statements. You said she would check to see if there was a balance on the account. That was the terminology that was used in the call. Sometimes the calls wouldn't use the exact terminology that we would as a— But a balance meaning, I owe the IRS money or the IRS— she's calling to say, Do I owe you money? I can't imagine making that call. I'm using those terms because that's the terminology that I remember from— I suspect that in most instances she was expecting a refund because she had put in the fraudulent tax return saying that she was entitled to about a $5,000 refund under this person's name and Social Security number. So that was really the nature of the calls. I just didn't want to overrepresent what they said. And I guess where I'm going is, and I don't know whether or not the evidence bears this out, but where I'm going is, is it reasonable to assume that there— I mean, almost $3 million was paid out on these returns. Is it reasonable to assume that there were returns where money was not paid out by the IRS? I mean, the false returns were filed, but she was not able to collect on them. That's correct. All right. There were a large number of those, in fact, and the record doesn't reveal whether the IRS simply didn't pay those, didn't process those, or in some cases her co-conspirators within the United States testified that they kind of latched on to the fact that this was actually fraud. Initially, Ms. Danieta would say, I'm preparing tax returns for people who have been deported and they have refunds owing them, but they're stuck in Mexico. I need to help these people. And so she told her contacts within the United States, that's what you're doing here. You're going to help these people. And when these people latched on to the fact that this was actually a fraud going on, some of them started to throw away correspondence and letters from the IRS. So it may be that ultimately those things, you know, disappeared into the trash. We don't know what happened, but she tried to get $8.2 million. That was the intended loss. Will you respond to Mr. Morrell's statement that Mr. Ramirez and some others whom he mentioned, but that Mr. Ramirez was running his own scheme, maybe parallel to or coincidental with? Those are my words, but could you reflect on that for us? Yes, Your Honor. Mr. Ramirez was the entree into finding Ms. Danieta. What happened is they identified Mr. Ramirez as cashing a number of checks. They took those checks and they identified the addresses that were associated with those checks. When they identified the addresses that were associated with those checks and they went to talk to people, the testimony shows that uniformly the people at those addresses said they were getting the tax returns that they were sending in from Ms. Danieta. That's how Ms. Danieta originally came to our attention. It's certainly possible that Mr. Ramirez and Mr. Larez were running parallel schemes doing stolen identity refund fraud. Stolen identity refund fraud is very common, but in this instance we know that these losses are connected to Ms. Danieta because we didn't just take a whole universe of returns that had this pattern in them. We also linked them to Ms. Danieta through the addresses. We went to the address first. We found that these addresses were linked to Ms. Danieta, and then we took the returns that were associated with those addresses, and they also showed the pattern. So all of that confluence of information shows that these are addresses and returns that are linked to Ms. Danieta, and if there were other returns that Mr. Larez or Mr. Ramirez were producing, those would not fall within what the IRS calculated here. And I'll note, too, that the way that the sentencing guidelines work, the cutoff for the 18-level increase that Ms. Danieta received was $3.5 million. So even if you cut away half of the return, the fraudulent returns that the IRS calculated, you'd still get over that $3.5 million mark. And if you use the calculation that the defendants are talking about, you just go down two levels or four levels, not a full 18 levels, because she admits that there was some loss and a substantial loss of millions of dollars associated with her fraud. But the intended loss is the correct one here, and there's no suggestion that Mr. Larez or Mr. Ramirez was producing these. In any event, it would be the defendant's burden to show that, not the government's burden to disprove that, because the PSR used — made a reasonable estimate of the loss. The district court adopted that, and under this circuit's precedent, then the defendant has to show that. It has to show that through more than speculation. That's this Court's decision in Simpson. It can't be that they just show that there's some plausible argument. They have to show that the PSR's estimate was unreasonable. The last issue before the Court is cumulative error, and because there was no error at all here, there can't possibly be cumulative error. And we'd also point out that at least the sentencing error is not something that this Court has ever put into the hopper as a trial error. The thrust of the cumulative error doctrine is that the trial was unfair through a series of trial errors, and that rendered the trial fundamentally unfair. This Court has never looked to sentencing and said that that would have retroactively rendered a trial unfair. I'd also need to note that although there were several references to the instructions, any instructional error would certainly be waived in this case. There was no objection made to the instructions in the district court. There's been no briefing whatsoever on instructions in this Court. And if there are no further questions, then I will urge this Court to affirm the judgment of the district court and yield back the remainder of my time. Thank you, Mr. Richter. Mr. Morales, you've saved time for rebuttal. I will be brief, Your Honor. I'd like to first address the issue about Mr. Ramirez again and what information was actually adduced at trial. What the Court needs to understand is that Agent Peavy, who is the primary witness for the government who investigated all of these matters, compiled the summary, brought forward all of these tax returns, he testified that Mr. Ramirez did not tell him at all that he had any knowledge or even knew Ms. Garcia-Denieto. Now, again, that's not to suggest that all members of the conspiracy need to know each other. But this does bring up certain issues regarding the proof adduced at trial, should these people have known each other. I think it's incumbent upon the government to create this in the way that they presented it at trial was that, yeah, you're going to have these individuals know one another. They must have known one another. But neither Mr. Larez or Mr. Ramirez testified or told Agent Peavy that they had any knowledge of Ms. Garcia-Denieto. So clearly there must have been several of these schemes running about, several of these schemes going on at the same time, and Agent Peavy testified that many of these were also still under investigation and that within the summary, matters attributable to Mr. Ramirez were contained within that summary. But again, what did not happen is these weren't necessarily parsed out, which ones were attributable to just Ms. Garcia-Denieto, which ones were attributable to Mr. Ramirez and others. But that's the issue at hand with that primary exhibit that was induced at trial and was really the primary piece of evidence against Ms. Garcia-Denieto. Now, the second thing I'd like to address, Your Honor, is to return again to the choice of counsel issue. And what I suggest to the court is that we try not to run afoul of the perception that the courts are doing things, again, ex parte, behind someone's back. The problem that Ms. Garcia-Denieto has with the way this was handled, Your Honor, is that her counsel was dismissed without an opportunity to be heard, without written findings, without any other rationale issued by the trial court. And again, with Judge Martinez, I'm surprised he handled it this way. But there was no rationale given other than to simply dismiss Mr. Del Valle. Now, again, I'm not suggesting that there may have not been an actual conflict of interest. I guess once all the matters were hashed out and everything was washed out in the end, perhaps Mr. Del Valle should have withdrawn from the case or not taken the case to begin with. But that's not the situation that presented itself to the court years ago. That was not the situation that the government brought to Judge Martinez. It's the opportunity to be heard that invokes a due process, Your Honor. That's the key. There's only two steps, is your notice and your opportunity to be heard. Those things are not real hard. And I don't think that we should be crossing over into a situation where the government and a judge can decide who someone's lawyer is going to be without any other inquiry into that matter. I know that's not what this court is suggesting. I know that's not what this court would do in this matter. I think it needs to be addressed, Your Honor. If there are no other questions, Your Honor, I yield back the rest of my time and I ask the court to grant Ms. De Nieto the relief she seeks in her brief. Thank you, Mr. Morales. Your case is under submission.